Madam Clerk, will you please call the next case, and would the attorneys please step up to the podium? 092787 David Blutcher v. Roseland Community Hospital Okay, good morning, Counsel. Good morning, Your Honors. Will you please state your name, tell me who you represent, and approximately how much time your argument will take? My name is Lynn Dowd. I'm for the defendant appellant, Roseland Community Hospital. My opening argument, about 15 minutes, and if I can reserve five for rebuttal, I'd appreciate that. Very good, Ms. Dowd. Counsel? Good morning, Your Honors. Michael Rasek. I'm here on behalf of the plaintiff, App Lee, David Blutcher. I would assume I should not need any more than 15 minutes. I hope to do less. Very good. Thank you. Ms. Dowd, you may proceed with your argument. Good morning, Your Honors. Good morning. May it please the Court, for the record, my name is Lynn Dowd on behalf of the defendant appellant, Roseland Community Hospital. And we are today requesting the relief of a complete vacatur of the judgment, or alternatively, a new trial on damages only, or alternatively, on damages and liability. As the Court is aware, we've had two trials in the lengthy history of this litigation, and with respect to the second trial, the primary issue I'd like to address was barring our economist, Dr. Knowles. With respect to the first trial, I'd like to address briefly the negligent credentialing cause of action, and possibly touch on the nursing allegations. And I can do either of those in any order, if the Court has a preference. You just proceed with your argument. Thank you, Your Honor. With respect to the second trial, and why we think, minimally, we should receive a new trial on damages, is that we submit, most respectfully, that the trial court abused its discretion in barring Dr. Knowles. This is one of those cases where, substantively, we were denied a fair trial, and the procedural course of conduct from the point of Dr. Knowles' deposition through the trial underscores how we were denied a fair trial, and that the entire issue could have been cured. As the Court's aware, 18- But to address this issue, Counsel, under the Trower case, were the plaintiffs entitled to obtain that information from your expert? No. Trower, my reading of Trower, it does not articulate a bright-line rule that experts must disclose their income. From all the records I've read, all the trials, that really does not happen. It can. It did happen here. The whole point of the inquiry is to assess the expert's credibility, and plaintiffs can certainly answer those questions. They're entitled to probe the financial bias, potential bias, to determine whether this person's a professional expert, but Trower does not say you have to answer those questions, and I think that's important for two reasons. One, let's say we went to trial with Dr. Knowles and plaintiff's counsel asked those questions. If Dr. Knowles sat there and refused to answer, the jury would understand that. They would attach a certain significance of credibility. What's important, point number two, under the facts of this case, is that the substantive information was provided, unlike in Trower and Hastings and the related cases dealing with this issue. Here, Dr. Knowles readily testified that 100% of his income came from consulting. Trower says you're trying to find out if the expert is a professional expert. Here, essentially, he was. All of his work was for consulting, either depositions or trial work. The jury got that information. If we have any confidence in the jury system under the facts of this case, Trower was achieved. So it would make no difference if he made a million dollars, 150? That I can't answer, Your Honor, but I submit the only answer to that is that at some point the court has to make a call on how far you let this line of inquiry go. Didn't the court give you several alternatives? The court, yes. And the court, that's important. You rejected them. Yes, and I think correctly so. We were not compelled, nor should we have been called upon, to acquiesce in some type of sanction when we believed then and now that Dr. Knoll's conduct was wholly appropriate and supported by the law. Didn't the trial court even ask you for a suggestion as to how he might get that information before the jury? And you rejected that proposal. That is correct, Your Honor, because I think in the United States of America, people should not be called upon to disclose their witness. To disclose their witness? I'm sorry, to disclose their dollar income. Even though they're holding themselves out as an expert. An expert on the merits with relation to economics. This was all designed just, this comes up in every trial, as the court knows, and the usual line of questioning is what are you charging? What percentage of, you know, do you do clinical work? Do you do teaching? You know, what percentage of your work is testifying as a consultant? How much for defense? How much for plaintiff? How much are you being charged today? You know, that line of inquiry, I think, is adequate for the jury, but to, A, to compel a witness to disclose their income, I mean, I've worked on a lot of medical and legal malpractice cases, and I think the pool of experts may well dry up. Now, that's not the primary reason, but I've had cases where Mr. Clifford and Mr. Powell appeared, and I don't think they would sign on to appearing. And, you know, maybe it's not fair for me to bring them as an example, but I've had cases with them where they've appeared as experts. In any event, the central point of Trower is that, and the language in the case is that the person conducting the deposition be given an opportunity to probe and challenge the witness's credibility. Remember, I think, and I know, the goal is a trial on the merits of the case. Credibility is always important, but it should not trump the merits of the case, which is what happened here. Again, under the unique facts of this case, the information was readily disclosed. He's a professional witness, essentially, 100 percent consulting. The dollar figure added nothing further to the equation. I mean, how far do we take this out? I mean, you know, the court is far more qualified than I to think of scenarios of more and more information. But the essential point here, the information was given to probe and challenge his credibility, but notwithstanding that, if this court interprets Trower as requiring an income determination, which, incidentally, the Hastings appellate court in 1995, post Trower, did not. There was no holding that you have to give the dollar income. You know, there, the court held that the jury was given ample opportunity to assess credibility and possible bias. That's all we're trying. That's all anyone is entitled to do in a trial, assess, to challenge credibility. Let the jury assess it. I think the facts are sufficient. But here, to have barred our expert on this ground for not answering one question in light of all this other information, I respectfully submit was an abuse of discretion and may well rise to the level of reversible error per se. My review of the case law that we've cited in our brief, it has always been reversed when the expert is barred. If there was some lesser sanction, and Your Honor has correctly identified in the record, we were asked to acquiesce in a sanction. We didn't because we don't believe we had an obligation to agree to a sanction when our expert did nothing wrong. But also, if you look at those cases and what happened here, to have barred our expert was really unconscionable. Dr. Knowles was deposed 18 months prior to trial. One question, answer, objection. In fact, defense counsel turned to plaintiff's counsel at the deposition and said, if this is important, take it before the court. Did that ever happen? No. During that 18-month period, there was no phone call between counsel, no letters, nothing to try to work it out among counsel. No motion to compel. Rule 219A says the proponent of the question. That's obligated? They're not obligated. It's a strategic call on their part. I mean, certainly I would hope the court doesn't want even parties not taking the deposition bringing every objection before the courts for a ruling. I don't think we can hire enough judges to handle that call. Basically you're saying the judge abused his discretion or her discretion? Yes, sir. Okay. Yes. There was no prior motion. There was no motion in limine. It was Day 2 of the defendants putting on their case in chief when there was this oral motion, a hail Mary call where they were successful. They tried it Day 3 with Dr. Bufalino. That didn't work. Even the judge said then and at the post-trial proceedings, he was very disturbed about plaintiff's counsel never bringing this to his attention when, in effect, he said, had you brought this earlier, I could have done something about this. And the case law indicates the proper remedy, if he truly believed he should have barred Dr. Knowles, was to grant us leave to get a new expert. But it's your position you had an absolute right not to have your expert disclose this information. That's your position, correct? Yes, sir, under trial and the facts of this case. You know, you're honest. Are there any other parts that you have a discretion on, like his schooling? I'm sorry. What about other things that he had to disclose or not disclose, like his schooling? We don't have any claim of error with respect to any of the other information. This was one question that gutted our case, gutted our defense in the second trial. One question led to a devastating ruling. I understand. What you're also saying, I guess, is that once he said that 100% of his income came from consulting as an expert, once he said that, he should not have to say, I made a million dollars last year doing this. Simply saying 100% should be good enough. Is that correct? Yes, sir. You know, the jury is comprised, we are told, of a group of smart people. I think people would get that. You know, that perhaps he had some affinity to testify a certain way. But, you know, I can't say any more than that. The information, the substance of information was communicated. With respect to the first trial, we submit that, and really the entire case, we really submit that we should have this judgment vacated. It's our position that the plaintiffs failed to prove their cause of action or causes of action, which boil down to two, at the end of the day, with respect to the hospital. To put this in context, during the post-trial proceedings, the court ruled as a matter of law. And this issue never went to the jury. It was never an issue of instruction. But I must say, I think it was a very wise call on defense counsel's part. In the post-trial proceedings after trial number one, defendants moved for a finding by the court that Dr. K was not the agent of the hospital. That was granted. That was never appealed. That is solid in stone in this case. The hospital has no responsibility for Dr. K with respect to any vicarious liability. So that brings the plaintiff to two theories of liability against the hospital. One is, you know, it's interesting they had the foresight to allege it because it wasn't formally recognized until 2007 in Frigo, the negligent credentialing. So you're saying the hospital has no obligation to check out credentials? No, that's not what I'm saying, Your Honor. I'm saying under the facts of this case and under Frigo, which is I believe the template for analyzing whether they asserted and proved a proper cause of action for negligent credentialing, the plaintiffs had to prove that the hospital was negligent in granting privileges to Dr. K to work at the Roseland ER because Dr. K did not have the credentials to work at Roseland's ER. No facts exist to support that. The facts of record are that Dr. K had the credentials. He had the schooling. He had the experience. He had the license. Board certification was not a requirement to work at the Roseland ER. Now, we know that Dr. K But he did represent to Roseland that he was board certified, correct? That is correct. And quite frankly He misrepresented that fact. Yes, he certainly misrepresented issues on his resume and his application. And as the plaintiffs point out in their brief, at most those constituted ethical violations. But we know ethical violations are not the equivalent of malpractice, nor Did Roseland check out anything about Dr. K? I can't say that, Your Honor. I went there today or back then and I said, here's my portfolio, my resume. I did past all these things. Would you hire me? That's a A hiring is different from the cause of action of negligent credentialing. I think we can all say we'd like our doctors Would you give me privileges? I'm sorry. I'm sorry? If I had all these credentials and writing anyway, would you give me privileges without checking any of them? In this case, the answer is yes, because he had the credentials. We're being called upon Would you check upon those credentials? Yes, to the extent that they checked on it, they relied on Dr. Mitchell. I understand Your Honor's question, like how far did they probe into his resume, his application? Obviously, they didn't discover the misrepresentations. But the essential point of that is that even if they discovered the misrepresentations, At most, that gives rise to an ethical violation, an ethical question. Would they have hired him? That's not the issue. The cause of action is that but for, under Frigo, but for Dr. K lacking a credential to perform the job of an emergency room physician, Plaintiff would not have been injured. There's no evidence of that. Negligent credentialing is not a cause of action where you fail to find out that somebody might have lied, or might have misrepresented, or might have had a DUI, or might have had some ethical obligation, or might have beat his wife. That is not negligent credentialing. As Frigo defines it as, does the person have the credentials to do the job? Dr. K did, whether or not Rosalynn found out about these other issues. Ethics are not credentials, ethical violations. Ethics are not malpractice. Is board certification required to work in an emergency room of a hospital in Chicago? In some hospitals, yes. Not at Rosalynn at the time. And I can't, as I stand here, articulate. I mean, this is every hospital's prerogative. There's different levels of care, board certification for different specialties. I mean, it really varies from hospital to hospital. That's why there's no, you know, an expert just can't come in and say, I wouldn't have hired him. You have to look at what are the credentials and requirements of that hospital. Dr. K had the credentials. There was no deficiency with respect to those facts. So that cause of action under Frigo was not proven, no matter what an expert says. The factual foundation has to be that a required credential, the doctor did not possess. That doesn't exist here. Dr. Kirshner in Frigo didn't have some of the requirements. He didn't have the skill. He didn't have the podiatric certification required. Therefore, he was not qualified to perform the podiatric surgery. Here, there's nothing to say Dr. K was not qualified to perform the work in the emergency room. What's the basis for your statement that he had the credentials? Have you submitted a document indicating what was required in order to practice as an emergency room physician in Rosalynn's hospital? Well, whether, you know, with respect to a document, in our brief we have cited the pertinent portions of the record through Dr. Mitchell, his employer who Rosalynn used to staff its emergency room. And Dr. Mitchell testified, as did the Rosalynn administrator, of what the credentials were, yes. There's no evidence that board certification for emergency room work or for being an internist was a requirement to work in the ER. Nothing. Okay. Finally, Your Honors, I know I'm pushing my time. I'd just like to comment briefly on the nurse's cause of action. A couple of points. We submit that this is not a basis for affirmance. And, again, the important facts are actually let me highlight a couple of things. First, there's been a lot of discussion about the nurses allegedly failing to do an EKG at 155 p.m. right before Mr. Blucher was discharged to Trinity. The specific issues instruction submitted to the jury was that Rosalynn was allegedly negligent, with respect to the nurse's conduct, for allowing Mr. Blucher to be transferred while in an unstable condition. There's no issues instruction submitted for failing to perform an EKG. I think that's important. And we have 45 volumes of record. When I drop down to fundamentals, I start with the issues instruction. You know, we've had a lot of talk and a lot of side discussions about the EKG, but that's not with the jury. You addressed the EKG when they did an EKG earlier in the day. Yes. When he first came in. Then he said later on, maybe about 9 o'clock or 10 o'clock, that he had chest pains and there was no further EKG. Then I guess another doctor came to the scene, and he was going to be transferred from one hospital to another. And then there was the issue of whether he was stable and there should be another EKG at the 155, which you're talking about. But what about when he alleged to have chest pains a few hours earlier, and the EKG was not given at that point? Your Honor, at all relevant times, Mr. Blucher was under the care of the physicians. All of that earlier conduct, he was under Dr. K's care, and plaintiffs spent a great deal of time in their brief discussing Dr. K's malpractice. Again, the hospital does not own Dr. K. He is not our agent at all. Now, importantly, with respect to the nurse's conduct, their lone nursing expert says that somehow the nurses should have on their own performed an EKG right before he was transferred at 155. A couple of points need to be made about this. Number one, notwithstanding that the jury was never asked to deliberate on that issue and resolve it. Secondarily, there's no expert, and I've searched the plaintiff's brief. Believe me, they have 2.1 million reasons for finding this evidence if it existed. There's no expert that connected the nurse's alleged failure to perform an EKG at 155 with the additional heart damage he allegedly sustained from a delay in getting the EKG at about 345, 350 that afternoon. No expert connected that 155 time period with the stroke two and a half years later. No one. There was no discharge against medical advice? No, and this is the second point. They didn't imply that the nurses said, well, he's okay, we don't have to do these tests? He was not being discharged against medical advice, and this is the second point I wanted to make. His own personal physician, Dr. Russell, ordered the transfer to Trinity. Dr. Russell came in later in the morning. There's Dr. Kaye and now two physicians. No expert, not even their nursing expert, said the nurses should have violated Dr. Russell's transfer order. Nobody said they should have ignored it, refused to permit the transfer, stood in front of the ambulance, whatever, and stopped his transfer so that they could do another EKG, which he received 40 minutes later. So that's important for two reasons. Number one, Dr. Russell's order, this issue boils down to cause and fact, I think, the legal cause, meaning absent the nurse's alleged conduct, not doing the EKG, the injury would not have occurred. There's no expert that gives us that information. Because they proved up the injury did occur because of Dr. Kaye, because of all these other people. No one, no expert, nursing or physician, said that because, you know, had the nurses performed the EKG at 155, he would not have suffered this additional heart damage and stroke two and a half years later. It's not in the record. Dr. Russell's order legally can also be viewed as an intervening, superseding cause in the proximate cause chain. So even if you could get to the point where you found there's a cognizable cause of action against the nurses that is sufficient to take to the jury, Dr. Russell cut that off with his order of transfer. And there's no expert that says the nurses should have violated that order, a physician's order, to get him to a different facility. This is just out of curiosity. If my doctor comes to the hospital and says, hey, I want him released, I want him to go over to Northwestern, where I have credentials I can treat him, and yet I am having a heart attack. If there's no obligation on those nurses or the original hospital, they just say, oh, he ordered it. Well, that's a different set of facts. If you look at our actual nurse's testimony, she didn't believe that he's, you know, in the midst of a critical condition, that if, you know, she doesn't speak up, he's going to drop dead. What does severe chest pains indicate? I'm a layman. It indicates he needs further treatment and evaluation. But again, the whole issue here is that the alleged delay in the timing of him getting the second EKG caused additional muscle damage, not the stuff from the morning. Plaintiffs are trying to back-fit it all into one package. But the allegation is that it caused additional heart damage, and that additional damage took him to a stroke two and a half years later. No expert connected that up. The proximate cause is not there on that level. And additionally, Dr. Russell is an intervening, superseding cause. He was the personal physician. He was watching this man. He gave the order. He's the one determining what treatment is appropriate for this particular patient at that moment. Unless Your Honors have any further questions, we request a complete reversal or alternatively, a new trial. Thank you very much for your time. Thank you, Ms. Dowell. Good morning again. Good morning, Your Honors. As I said, Michael Rasak. I'm here on behalf of the plaintiff's affilee, David Butcher. I'd like to examine the issues in the same order counsel raised them. The difficulty that they have with the order affecting Dr. Noll's ability to testify is that the Chower case would appear to be right on point. Chower said that the parties have a right to know the annual income earned by an expert witness as an expert for the very reason that the size of his income, the amount of his income, could very likely come into play in front of a jury. As a matter of fact, one of the reasons that Dr. Noll gave when he was offered the alternatives was, I don't want them to know my income. That's the whole idea behind Chower. If somebody's making a million dollars a year, there's a potential for someone to believe they might stretch the truth. If they're making $100 a year, maybe not. Your opponent says that Chower does not provide a bright line. You maintain it does. I believe that it does, and if it did not, in this case, the trial court judge made every effort to accommodate them, and that was going to be my main point here. It's a question of discretion, and the trial court judge offered three different alternatives to assist the matter and let them put him on the stand. The first was simply to seal that part of the record so nobody except the jury would know. They refused it. He just said no, he wouldn't do it. After the trial was over, the judge said, I just did not understand why that witness and that lawyer would not accept that way to handle the matter. He would be able to testify. The jury would know how much he made in the last two years as an expert witness, but nobody else would know. His belief that he has some sacrosanct right to keep his earnings as an expert secret, contrary to Chower, would have been satisfied, and the judge offered to let him testify that this is how many hours I worked last year and this is how much I charge per hour, and the doctor said, well, no, then the jury can still figure out what I made, and the judge said, okay, what if I let him testify without answering the question, but I will give 5.01, IPI 5.01 to the jury, telling the jury that you can draw an adverse inference from that, and counsel said that's not acceptable. If your honors have any doubts, but that part of the record, the judge goes on and on. The trial judge tried so hard to accommodate everybody and couldn't do it, and he couldn't do it because they were stubborn about it, because their expert was stubborn about it. I mean, the judge even said, why did the hospital ever keep this person on as an expert witness when they knew this was coming up? I mean, the judge doesn't, trial judges don't appreciate being put into a box where they have to make a hard decision when they didn't have to be put in that box. Somebody could have either, could have worked this out in advance. Well, did he put them in a box, didn't even ask, or do you have a suggestion as to how we might have listened? He did. Just give me something. And there was nothing forthcoming. The problem in the case was that the trial, is that the defendants at trial took a solid position, went back off, wouldn't accommodate anybody, and Trower said that you have to do that. And Trower is a Supreme Court case. Actually, I think Counsel's first point was the second trial was at an abusive discretion. What's your answer to that? Oh, I'm sorry. As I recall, the first thing she said, the second trial, ordering the second trial was at an abusive discretion. Yes, I can, Your Honor. I don't have any problem with going through that at all. There were two different grounds for the trial court's award of the second trial. The first, and one that's not touched upon in the defendant's brief at all, was the fact that the jury in the first case came back with a very limited lost wage award. And the trial court judge looked at it and said, the lost wages that the jury awarded you are less than what your counsel in closing argument said you would have lost as a minimum. The trial court judge said you were awarded $200,000, but the hospital's counsel in closing argument suggested a minimum of around, I believe it was $400,000. And the trial court judge said the reason that occurred was because the jury saw the surveillance video. The surveillance video is without sound. The injury in this case, and I know Your Honors have read the transcript, is one of cognition and ability to communicate, and that a video without sound not only would not reflect on that, but in fact might aggravate the situation by suggesting, because the video shows this man walking around and driving and being with people, might imply that he was fine. He said it had an adverse prejudice. The judge said that should not have come into evidence, and that was one of the grounds for the new trial. The other ground was that the first jury awarded zero for medical expenses, and it's just not clear why they did that. The judge said there was no reason to do that. The bills were not in issue. They were agreed to. He said that alone illustrated their confusion, along with the fact that when they awarded future medical, they got that wrong as well. They gave too much. And the trial court judge made it very clear. He said there's no evidence here of a compromised verdict, and damages and liability are very separate. All this was within his discretion. The other point that counsel raised today is the question of whether or not Plaintiff proved his case against the hospital. And we made the point in the brief, Plaintiff had two separate causes of action against the hospital. One for the credentialing error with respect to Dr. K, who I think, I don't think anybody quarrels, didn't do anything right here. And the other question was whether or not the nursing staff at the hospital committed negligence. And if I can just start with the latter first. Dr. Fentel testified that Dr. K and the hospital staff both violated the standards of care. The testimony in this case was not limited to Dr. K in terms of doing things wrong. The testimony was directed at the nursing staff at the hospital. Nurse Schroeder, our expert, said the nurses can't do an EKG without a doctor's order. I think Dr. Fentel, I believe, said the same thing. Dr. Rosenberg, who is the hospital's expert witness, said the nurses can't do an EKG without a doctor's order. Nurse Schroeder said they should have. And our experts, all of them, agreed that if you had done the EKG at 9 o'clock when Mr. Blucher had chest pain, he would have seen the stress. He would have seen the heart attack. He would have given him the TPA. The TPA would have opened his artery. He wouldn't have had, essentially, and I may be preaching to the choir, but I just don't want this to be unclear. He had a heart attack. The artery is blocked off. Blood does not get to that particular section of his heart. In this case, the artery that was blocked was the artery that feeds basically a bottom chamber of the heart that does a great deal of pumping. Without blood, the muscle started to die. When the muscle dies, the heart can't, that chamber doesn't beat effectively anymore because the wall can't squeeze it shut. The blood coagulates and clots, and that's what caused the stroke two and a half years later. Even the treating doctor, Dr. Frank, said that's where the clot came from, and he disproved any other source for the clot. Help me out a little bit on this point. So at 9 o'clock, the doctor was there and the nurses were there. Nurses were there. Chest pain. So if the doctor didn't think it was necessary, can the nurses just override the doctor and just order something? That's correct. There's no evidence that the doctor thought it was unnecessary at 9 o'clock. Dr. K did not testify in this case, so we don't know what he did or didn't do. But all the testimony outside of Nurse Locke from the hospital, the other testimony is that a nurse can, in fact, order an EKG. Nurse Locke, the hospital Rosen's treating nurse in this case, said, the best way to diagnose a heart attack is with an EKG while there's pain. That's her testimony. And everybody agrees a nurse can do it. They do not need a doctor's order. Dr. Fintel said what you should do is you take the EKG and you show it to the doctor. Well, everybody's agreed that the EKG would have ‑‑ not everybody. All of the plaintiffs' witnesses and the treating doctors agreed that if you do the EKG, it will show a heart attack. And that Dr. K would have done the right thing. If he wouldn't have done the right thing, it's because he wasn't competent. And that was the other half of our case. It wasn't just a question of credentialing. Dr. Castile specifically said, I've already shown in my testimony that the doctor who did the transfer, and that's K, did not know what he was doing. And the other testimony, if you'll let me recall, was to the effect that if a qualified doctor had been in the emergency room, he would have known it was a heart attack. He would have given the TPA. The testimony was really designed to show that K was not only did he lie about his credentials and about the number of times he'd been sued, but he simply wasn't competent. There's really two prongs to the competency issue. And there was one more prong with the credentialing, which kind of got buried along the way. Charles Brosseau, our hospital care management expert, the only one who testified in that category, said that the hospital also violated its standard of care when it failed to re-credential Dr. K. And the implication was because he wasn't qualified to be there, they would have discovered he wasn't qualified. So they erred on so many levels, keeping in mind that Dr. K flunked the boards either seven or ten times, depending on whose testimony he believed. Mr. Brosseau said he'd never seen anything like that. Ms. Dowd argued that you didn't have a witness to testify with respect to the standard of care for nurses. Is that true? Is that what Ms. Schroeder did? That's what Ms. Schroeder did. And that's set out at length in our brief. It would take me a minute to get to the page, but Ms. Schroeder, she went through the whole situation of what you're supposed to do. She said you didn't have any evidence to support that particular claim in your complaint. Ms. Schroeder testified at length, and everybody else backed her up. And it was backed up by Dr. Fentel's testimony. It's at 175 and 176 of Volume 34, and then again at 18 and 19 of Volume 38, that Dr. K and the staff violated the standard of care, not just Dr. K. The criticism here went to everybody all morning. Dr. K, and he's not the agent. We understand that. But that's why there's a credentialing claim, as in Prego. And the nurses who did not do an EKG. They didn't even do the EKG that should have been done at the time of transfer. But that's why the issue in the first case was you transferred him before he was stable. That was the issue in the first case. You get the patient stable by doing the EKG, finding the heart attack, giving him the TPA, and now he will be stable, and now you transfer him. But when he was transferred, it wasn't a quick transfer. If your honors recall, by the way, Dr. Russell did not transfer him. Dr. K transferred him. Only a treating doctor, the only attendee could transfer. That's who signed the order here. When they transferred him, the staff at Roseland sent along the first EKG, but the name wasn't on it. If your honors recall, the EKG that showed up at Trinity, the doctor at Trinity said, I can't be sure it's his. And they had to wait for it. So the period of time between the transfer and the time he finally got the EKG was not until 235. And if your honors recall, the testimony in this case, I hope I'm not misquoting it, but I think minutes mean muscle, I think is what some of the people listed. When you cut off circulation to a muscle, minutes can count. And Dr. Fentel and Dr. Castile both said that was the case here. Minutes matter. Every step along the way matters. And as to weigh each part of that out, to pick was it this or this or this moment, that arguably was for the jury. Unless your honors have further questions, I've used my time. Thank you, Mr. Rathsack. Thank you very much. Ms. Dow, do you have some brief rebuttal? Thank you, your honors. I'll try to be brief. In response, by way of clarification, your honor, I've asserted it was an abuse of discretion to bar Dr. Knowles, not necessarily to have ordered a new trial. We submit that we were entitled to a judgment notwithstanding the verdict on the first trial for their failure to have proven both causes of action. Now, given that, with respect to the Trower decision, and I know the court has and will continue to scrutinize it, I'm looking at page 221 of the opinion, and this is the Supreme Court stating, quote, however, we believe that fairness does not dictate that from this single question should spring such broad inquiries into the merits of former cases. As previously stated, we are confident in the jury's ability to recognize that the fact that a witness has typically testified for a category or a party does not mean that his testimony in previous cases was ill-founded. There, as you recall, they wanted to delve into Dr. Kirchner's prior testimonies. I've cited that because it highlights the Supreme Court's looking at the jury's ability to evaluate the information they're given. Now, if I flip ahead to page 222, the holding, it says, we hold that the circuit court did not abuse its discretion in permitting defense counsel during cross-examination of plaintiff's witness to inquire regarding the annual income derived from services relating to serving as an expert witness, and two, the frequency with which the witness's testimony in prior cases had been for people suing doctors. The holding right there does not say, again, there's no bright-line rule. They have to give the answer. You can inquire, and if a witness refuses, that's for the jury to evaluate. I'm sure these able trial attorneys would make a fine run at that in closing argument. However, the point is again here, they inquired and they got the information sufficient for a jury to evaluate. Number two, a couple clarifications. I agree with Mr. Rathsack that Dr. Russell did not technically order the transfer. That's correct. In consultation with the attending physician, with Dr. Kaye, those who had privileges made the formal order. But this was at the behest of Dr. Russell. And also Dr. Russell, contrary to the allegations against the nurses, said that Mr. Blucher was stable when he went over to the hospital. With respect to Dr. Fintell's testimony, he can't give nursing standard of care testimony. They had one nursing expert, Nurse Locke. Contrary to Mr. Rathsack's argument and their brief and what happened in this first trial, whether Dr. Kaye committed malpractice is different from whether the hospital is guilty of negligent credentialing. Malpractice is not equal, is not the equivalent of negligent credentialing. Moreover, I would cite the court to Dr. Del Castillo's testimony at pages 236 and 37 in the record. In there on cross-examination, he was asked specifically whether he could opine whether Mr. Blucher, had he received the TPA 52 minutes earlier, which is the entire gist of their cause of action against the nurses, that somehow that delay contributed to this. Would the outcome have been different? He said no. It's right in there on those pages. Their own expert. This is why in their entire brief, this evidence is missing. It's not there and there's evidence to the contrary. And our essential point with respect to the nurses is that there is no expert in this record that linked the causation for the nurses' alleged deviation to the injuries at issue. No one alleged that the nurses were responsible for the heart damage caused earlier in the morning or for the damage caused by Dr. K. Nurse Locke, no one said they were responsible for that. This whole 155 p.m. point of alleged negligence has to be linked up as a cause in fact, proximate cause through an expert to the stroke two and a half years later. It's just not there. Thank you very much, Your Honors. All right. Thank you, Ms. Dowd. I want to compliment the attorneys on their arguments on the briefs. This matter will be taken under advisement in the courts in recess.